MJC:maz 95465 \Pleadings\95465 73 MIL re Inj 5-28-24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NELSON SANTIAGO, ET AL          :
                                :
        VS.                     :        C.A. NO. 1:19-cv-00591-JJM-PAS
                                :
MATTHEW SHERIDAN, ET AL         :

## DEFENDANTS' MOTION IN LIMINE RE:  INJURIES/DAMAGES/MEDICAL RECORDS

*[In addition to the content of this motion, the defendants incorporate the
factual background enunciated in their pre-trial memorandum of law.]*

Now comes the defendants and move, in limine, to preclude the plaintiffs from introducing
and/or referencing certain evidence, as more particularly described below, that relates to alleged
injuries and damages.

### A.  PLAINTIFF SANTIAGO — ALLEGED FOOT FRACTURE

Plaintiff, Nelson Santiago submitted evidence suggesting a fracture-type injury to his foot,
identified as a tarsal navicular fracture.  The plaintiff submitted partial records from Brigham and
Women's Faulkner Hospital regarding his emergency room treatment.  The defense followed up with
a records subpoena for additional records.  While the records do confirm that there was this type of
fracture, no evidence has been put forward to date to causally link the injury to this incident or to the
defendant Sheridan.  Moreover, no medical expert has been identified or disclosed to make such a
connection.  Such an injury is not the type that is self-evident as to its cause.  According to the
literature (See **Exhibit A**.), such a fracture can result either from trauma or from undue stress, with
the latter having a higher incidence in younger individuals and athletes.  In the medical records
obtained, the plaintiff indicated to medical personnel that he did not know if he injured his foot from it
being stepped on or from him twisting it during his movements.  Moreover, according to his
deposition testimony, the plaintiff is essentially guessing that his foot was fractured from being
stomped on.  (See **Exhibit B**.)  "I didn't know (it happened then) but that's how I figured out after the
fact", Plaintiff's Dep. (See **Exhibit C**) at p.89.  Nor does the plaintiff know whether such a stomp, if

it did take place, was accidental or intentional, Plaintiff's Dep. at p. 90. Beyond that, he testified that he did not know who it was that stomped on his foot, and, for sure, it was not Sheridan because Sheridan had been with the plaintiff Sanchez and when Santiago got up from the ground (after feeling his leg/foot stomped on), he saw neither Sheridan or Sanchez in the vicinity, Plaintiff's Dep. at pp. 91-95. Without a medical expert to opine as to the etiology of this injury, it would require pure speculation as to whether or not this was the result of inappropriate conduct or accidental conduct or even whether or not it occurred on the evening in question. Moreover, it would require speculation to link it to an action of the defendant, especially since the plaintiff's own testimony is that Sheridan was not around him at the time he felt someone stepping on his leg/foot.

For the same reasons, no evidence should be permitted or introduced regarding any effect on the plaintiff Santiago's ability to work since, without the necessary causal relation being established, and without the ability to link the same to defendant Sheridan, such evidence would be lacking in foundation and unduly prejudicial to Officer Sheridan and *vis-a-vis* the City.

### B. PLAINTIFF SANCHEZ

Other than producing a record or two from his emergency room visit the day following this incident, plaintiff Sanchez produced no medical records and has identified no medical expert to testify as to any alleged injuries sustained. Aside from scrapes and bruises, which, depending on his credibility, the plaintiff could testify to, the problem here is his deposition testimony, which was taken in April of 2023. There, Sanchez testified that he still didn't think he could work because of injuries sustained in this incident, that some 5 ½ years after the event, See **Exhibit D** - Plaintiff Sanchez Dep. at pp. 10-12. Without a medical expert and a vocational expert, there is simply no foundational basis for such testimony.

As such, your defendants respectfully request that this motion be granted.

DEFENDANT, CITY OF PROVIDENCE,
By its Attorneys,

/s/ Jillian H. Barker
Jillian H. Barker, Esq. #8353
Senior Assistant City Solicitor
/s/ Steven B. Nelson
Steven B. Nelson, Esq. #8142
Senior Assistant City Solicitor
CITY OF PROVIDENCE
444 Westminster Street, Suite 220
Providence, RI 02903
PHONE: (401) 680-5520
FAX: (401) 680-5333
EMAIL: jbarker@providenceri.gov
EMAIL: snelson@providenceri.gov

DEFENDANT, SHERIDAN,
By his Attorney,

/s/ Michael J. Colucci
Michael J. Colucci, Esq. #3303
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499
EMAIL: mjc@olenn-penza.com

## **CERTIFICATION**

I hereby certify that I have filed the within with the United States District Court on this 6th day of June 2024, that a copy is available for viewing and downloading via the ECF system, and that I have caused a copy to be sent to:

Albert E. Medici, Jr., Esq.
1312 Atwood Avenue
Johnston, RI 02919

Jillian H. Barker, Esq.
Steven D. Nelson, Esq.
Senior Assistant City Solicitors
City of Providence
444 Westminster Street, Suite 220
Providence, RI 02903

/s/ Michael J. Colucci

-3-

# EXHIBIT A

NCBI Bookshelf. A service of the National Library of Medicine, National Institutes of Health.

StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022 Jan-.

# Tarsal Navicular Fractures

Rohan Gheewala; Abdul Arain; Andrew J. Rosenbaum.

Author Information

Last Update: July 12, 2022.

## Continuing Education Activity

Fractures of the tarsal navicular bone are most commonly the result of either traumatic injury or undue stress, with the latter having a higher incidence in younger individuals and athletes. This activity describes the evaluation, pathophysiology, and treatment of tarsal navicular fractures; and reviews the role of interprofessional team care for the management of patients with this condition.

**Objectives:**

- Describe the etiology of tarsal navicular fractures.

- Review the treatment strategies and operative indications for tarsal navicular fractures.

- Describe the imaging findings and radiographic findings to diagnose and manage tarsal navicular fractures.

- Describe the importance of interprofessional communication and collaboration amongst multiple medical disciplines and clinical staff to improve the prompt and efficient care coordination for the management of patients with tarsal navicular fractures.

Access free multiple choice questions on this topic.

## Introduction

Fractures of the tarsal navicular bone are most commonly the result of either traumatic injury or undue stress, with the latter having a higher incidence in younger individuals and athletes. Even though midfoot fractures are relatively uncommon injuries, tarsal navicular stress fractures represent up to one-third of all stress fractures.[1][2] These fractures are at high risk of nonunion and osteonecrosis owing to the navicular bone's tenuous blood supply as well as the inherent complexity of the joint.[1] These fractures often require surgical intervention, though they can be treated conservatively in some cases.

The navicular is a wedge-shaped bone articulating with the talus, calcaneus, the three cuneiform bones, and the cuboid.[3] The bone's major oblique axis lies dorsoplantar and lateromedial, with its base situated dorsolaterally, and its apex plantar medial.[3]

Posteriorly, the navicular has a biconcave surface which articulates with the head of the talus.[3] Anteriorly, the navicular has plantar concavity, with there being three articular surfaces.[3] The largest of these surfaces is found medially with a convex surface, articulating with the medial cuneiform.[3][4] The navicular tuberosity, found medially, is the insertion site for the posterior tibial tendon. Considering the large number of articulations found on the various surfaces of the navicular, a large portion of the bone is covered in articular cartilage.

The dorsal aspect of the navicular receives vascular supply by the medial tarsal branches of the dorsalis pedis artery, along with branches of the lateral tarsal artery[5]. Supplying the medial plantar aspect of the navicular is a branch of the tibialis posterior artery.[5] Some literature suggests a zone of avascularity from the central third to the distal cortex of the navicular, which may contribute to the avascular necrosis sometimes associated with these fractures.[5]

The tarsal navicular is an essential component of the Chopart joint, which itself consists of the talonavicular and calcaneocuboid joints.[6] Both of these joints are crucial for inversion and eversion of the foot.

## Etiology

While the biomechanics behind stress fractures of the tarsal navicular are somewhat poorly understood, those of traumatic injuries are more comprehensively elucidated. It is known, however, that stress fractures are a chronic overuse injury associated with microfractures of the bone[7] Traumatic injuries can cause a variety of navicular fracture patterns, including avulsion fractures, tuberosity fractures, and body fractures.

Avulsion fractures of the navicular may occur dorsally, medially, or in a plantar direction, depending on the force applied to the midfoot. In the case of foot dorsal avulsion, fractures result from extreme plantar flexion causing undue stress on the deltoid and dorsal capsules.[1] Excessive pull from the posterior tibialis tendon can result in medial and tuberosity fractures, and plantar avulsion fractures are secondary to ligamentous injury.[1]

Navicular body fractures can be caused either by a direct or an indirect force. The Sangeorzen classification, devised in 1989, is the leading system for grading tarsal navicular body fractures. [1] This system classifies tarsal navicular body fractures according to the direction of the fracture line, degree of disruption of surrounding joints, and the direction of foot displacement.[8] In this classification, a Type-1 injury is one that occurs in the coronal plane, with no angulation of the forefoot. A Type-2 injury is one that has a dorsolateral to plantar-medial fracture line with medial displacement of the major fragment and forefoot. A Type-3 injury is a comminuted fracture in the sagittal plane of the bone, with lateral displacement of the forefoot. There are several other theories on the forces causing navicular body fractures, though all are due to axial forces on a foot in plantar flexion.[8][7]

## Epidemiology

Midfoot fractures only represent a small portion of all foot injuries, though stress fractures comprise approximately one-third of all stress fractures of the foot.[7]

In the case of traumatic navicular injuries, the vast majority result from motor vehicle accidents, followed by falls and blunt injuries.[9] Stress fractures are most common in young individuals with high functional demand such as competitive athletes.[7]

## History and Physical

Patients of avulsion fractures typically present with a significant degree of pain in the midfoot area, particularly during push-off of the fractured segment. Patients who have endured a navicular body fracture are typically unable to bear any weight on the affected extremity and present with a profound degree of swelling on the dorsal and medial aspects of the foot, all of which is due to the mechanism of the injury and disruption of the medial column of the foot.[10]

# EXHIBIT B

**Mass General Brigham**
Brigham and Women's Hospital

BWF Faulkner Main Campus
1153 Centre St
Jamaica Plain MA 02130-3446

Santiago, Nelson
MRN: 10058696, DOB: 11/16/1992, Sex: M
Acct #: 6046111601
ADM: 11/13/2016,    D/C: 11/13/2016

**11/13/2016 - ED in Brigham and Women's Faulkner Emergency Department (continued)**

**ED Provider Note (continued)**

on ground with 6 police officers on top of him, sustained abrasion on forehead and nose with mild swelling.  No LOC, no visual changes, no n/v, no neck pain/back pain, + pain R ankle unclear how it was injured, whether it was an inversion injury or someone stepped on it.  Last tetanus vaccination unknown.


Exam:
BP 136/79  Pulse 86  Temp 36.7 °C (98 °F) (Oral)  Resp 16  Ht 1.753 m (5' 9")  Wt 72.6 kg (160 lb)  SpO2 99%  BMI 23.63 kg/m2
Well appearing, NAD
Abrasion to nose, no crepitus but soft tissue swelling, no septal hematoma, no dental fractures/malocclusion, PERRL, EOMI
No midline c/t/l spine tenderness
RRR
Lungs CTA
abd soft and NT
No CVAT
L foot pain with dorsiflexion/extension, + swelling anterior and inferior to lateral malleolus, no bony tenderness
Neuro exam non-focal

Assessment & Plan:  S/p altercation.  Canadian head CT rules negative.  Will do XR ankle.  Update tetanus vaccination.  Advised to ice nose, f/up with ENT if deformity when swelling resolves.


Labs Reviewed - No data to display


I have personally seen and examined the patient and reviewed the PA's findings and plan. As necessary, I have appended the note with my suggestions, comments or clarification to their findings and plan in the note above. This is a shared visit with the PA.


Sara Tuttle-Lane, MD
11/13/16 1753


Electronically signed by Sara Tuttle-Lane, MD at 11/13/16  5:53 PM


**ED Notes**

**ED Triage Notes by Susan Mamaril, RN at 11/13/2016 1547**

| Author: Susan Mamaril, RN | Service: Emergency Medicine | Author Type: Registered Nurse |
| Filed: 11/13/2016  3:48 PM | Date of Service: 11/13/2016  3:47 PM | Status: Signed |
| Editor: Susan Mamaril, RN (Registered Nurse) | | |

Reports was with police and had altercation and c/o top of right foot pain, abrasion on forehead.

Electronically signed by Susan Mamaril, RN at 11/13/2016  3:48 PM


**ED Notes by Kristen Jean Dolan, RN at 11/13/2016 1841**

| Author: Kristen Jean Dolan, RN | Service: — | Author Type: Registered Nurse |
| Filed: 11/13/2016  6:42 PM | Date of Service: 11/13/2016  6:41 PM | Status: Signed |

# EXHIBIT C

CONDENSED

### In the Matter Of:

Santiago, et al. vs Sheridan, et al.

1:19-cv-00591-JJM-PAS

---

## NELSON SANTIAGO

*April 11, 2023*

---



800.211.DEPO (3376)
EsquireSolutions.com

NELSON SANTIAGO
Santiago, et al. vs Sheridan, et al.

April 11, 2023
89—92

Page 89

1    A. I don't know.
2    Q. You don't know who it was?
3    A. Yeah.
4    Q. You believe Sheridan was still with
5 Abel at the time, right?
6    A. I believe so.
7    Q. All right. So then you felt your arms
8 being placed behind your back?
9    A. Yup, and -- I felt like a foot being
10 stomped on the back of my leg, which is how my
11 foot got fractured.
12    Q. How do you know it happened then?
13    A. I didn't know, but that's how I
14 figured out after the fact.
15    Q. You felt someone, did you say stomp on
16 your foot?
17    A. I don't know.
18    Q. Is that what you said?
19    A. Yeah.
20    Q. I don't want to put words in your
21 mouth?
22    A. Yeah.
23    Q. You felt a stomp?
24    A. Yeah. Someone's foot on the back of
25 my foot.

Page 90

1    Q. What's the word you said, someone's
2 what?
3    A. Someone's foot on top of my foot.
4    Q. Okay. Someone had their foot on your
5 foot?
6    A. Yeah.
7    Q. Did they stomp on your foot, or just
8 place their foot on your foot? It's two
9 different things, I'm trying to get from you
10 what you remember?
11    A. In the midst of everything it's hard
12 to know, you know.
13    Q. You really don't know, do you, right?
14    A. I don't -- I know there was a big
15 stomp on my foot, I don't know if it was
16 intentional or not.
17    Q. That's fair. If you remember someone
18 stomping on your foot, I'm asking you to tell
19 us.
20    A. Yes.
21    Q. Do you remember that?
22    A. Yes.
23    Q. Do you know if it was intentionally?
24    A. It felt like it was.
25    Q. What makes you say that?

Page 91

1    A. Because my foot became fractured.
2    Q. You believe that's when it happened,
3 the fracture of your foot?
4    A. Yeah.
5    Q. When you went down, did your foot
6 twist in any certain way?
7    A. No.
8    Q. In like an unnatural position?
9    A. No.
10    Q. You don't know who it was that made
11 contact -- stomped on your foot?
12    A. No.
13    Q. One stomp?
14    A. Could have been multiple, I don't
15 remember. I didn't know -- I felt pressure on
16 my foot.
17    Q. When you felt that pressure, did you
18 feel pain?
19    A. Not immediately.
20    Q. Did you feel anything that made you
21 think ut-oh, I just broke my foot?
22    A. Not until the next day when I couldn't
23 walk.
24    Q. At the moment it was happening, you
25 felt pressure on your foot, but you didn't feel

Page 92

1 like your foot was breaking at that time?
2    A. Yeah. Uh-huh.
3    Q. Is that correct?
4    A. Yup.
5       MR. COLUCCI: Off the record.
6       (BRIEF RECESS)
7    Q. You were on the ground, you felt a
8 stomp?
9    A. Yeah.
10    Q. At some point did someone pick you up,
11 or did you get up on your own?
12    A. No, they ended up grabbing me up.
13    Q. When you got up, did you see the
14 officer who was with you?
15    A. No. I don't recall.
16    Q. All right. What happened at that
17 point, you get picked up off the ground?
18    A. Yes, so after the whole incident --
19    Q. You were handcuffed at the time,
20 right?
21    A. Yeah.
22    Q. Picked up?
23    A. Yup.
24    Q. Anyone strike you after you were
25 handcuffed?



NELSON SANTIAGO
Santiago, et al. vs Sheridan, et al.

April 11, 2023
93—96

Page 93

1    A.  When I was on the ground, yeah.
2    Q.  No, after you were handcuffed?
3    A.  I was handcuffed on the ground, and I
4  felt strikes after that.
5    Q.  You felt strikes.  Where did you feel
6  strikes?
7    A.  On my back.
8    Q.  On your back?
9    A.  Yeah.
10    Q.  What type of strikes?
11    A.  Just punches and stuff.
12    Q.  How many?
13    A.  I'm not sure.  Multiple.
14    Q.  More than ten?
15    A.  No, I wouldn't say more than ten.
16    Q.  Did anyone say anything when they were
17  striking you, was there any conversation going
18  on?
19    A.  I was just shouting, because I'm
20  getting beat up, you know.  I'm just in shock.
21    Q.  You're shouting?
22    A.  Yeah.
23    Q.  Do you remember what you were
24  shouting?
25    A.  Anything, Get off me; Why are you guys

Page 94

1  doing this?
2    Q.  Was anyone saying anything back to
3  you?
4    A.  I don't recall.
5    Q.  When you were face down, all that time
6  until you were pulled up, right?
7    A.  Yup.
8    Q.  When you were picked up off the
9  ground, at that time did you see where Abel
10  was, or was he behind you?
11    A.  No, I don't remember.  I don't
12  remember.
13    Q.  Did you see Sheridan anywhere once you
14  were picked up?
15    A.  I don't remember.
16    Q.  Do you think Abel was still there, or
17  could he have been taken away somewhere when
18  you were first picked up?  Did you have a
19  sense?
20    A.  No.  They might have taken him by that
21  time, by the time I got up.
22    Q.  Would that be you don't know where
23  Abel was?
24    A.  Yeah.
25    Q.  Same for Sheridan?

Page 95

1    A.  Yes.
2    Q.  Assuming Sheridan was still with Abel;
3  is that correct?
4    A.  Yup.
5    Q.  What about the other guys in the car,
6  where were they when you got up, were they
7  still in the car, or were they out?
8    A.  I really don't remember.  The whole
9  thing was just a blur, you know.
10    Q.  When you first got out of the car and
11  went around the back, did the other guys get
12  out with you, or did they stay in the car,
13  Kenny and Jose?
14    A.  I believe they were still in the car
15  when I got out.
16    Q.  Do you know if they ever got out --
17  strike that.  Do you know if they ever got out?
18    A.  I don't know.
19    Q.  Last you knew they were still in the
20  car, right?
21    A.  Yeah.
22    Q.  And then you get arrested on the
23  ground and picked up?
24    A.  Yup.
25    Q.  And you don't know where they were at

Page 96

1  that time, or do you think they were still in
2  the car at that time?
3    A.  I don't remember.
4    Q.  Did they ever tell you, ever talk
5  about it?
6    A.  I don't remember honestly.
7    Q.  Did Kenny ever say he saw anything?
8    A.  They seen everything.
9    Q.  What do you remember Kenny telling you
10  he saw?
11    A.  Basically we were getting beat up.
12    Q.  Jose, did he ever say anything?
13    A.  Same thing, we were getting thrown to
14  the ground, mishandled.
15    Q.  Did either one of them say they ever
16  got mishandled?
17    A.  No.
18    Q.  Did either of them, Kenny or Jose, say
19  they ever got touched by any of the police
20  officers there?
21    A.  Not that I remember.
22    Q.  Did you ever see either one of them
23  get touched by any of the officers there?
24    A.  No.  I was on the ground, I didn't see
25  anything.

# EXHIBIT D

CONDENSED

## In the Matter Of:

## SANTIAGO, ET AL V. MATTHEW SHERIDAN

1:19-cv-00591-JJM-PAS

---

## ABEL SANCHEZ

*April 11, 2023*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

ABEL SANCHEZ
SANTIAGO, ET AL V. MATTHEW SHERIDAN

April 11, 2023
9–12

**Page 9**

1  doing Uber driving?
2     A.  Yes.
3     Q.  Did you own a vehicle at the time?
4     A.  No, I didn't.  So what we do it as a
5  group and, you know, one of us would go get the
6  items, and bring them to the car, one of us
7  would drive, one of them would deliver the
8  item.  And we would just split at the end of
9  the week or month, or however you wanted to do
10  it.
11     Q.  This is the same vehicle that Nelson
12  was talking about?
13     A.  Yeah, it was a new Prius.
14     Q.  The four of you owned it?
15     A.  Not four of us owned it, but we
16  practically paid for it by working and just
17  paying for it.  It was under somebody's name.
18  Might have been Jose's, I'm not sure.
19     Q.  And you did both DoorDashing and Uber
20  driving with it?
21     A.  Yup.  Uber Eats.  Uber Eats is like a
22  different type of Uber, it's for food.
23     Q.  So, it's the same job you're talking
24  about, Uber Eats and DoorDashing?
25     A.  Right.

**Page 10**

1     Q.  So after this incident with Providence
2  Police, you never returned to work anywhere; is
3  that fair statement?
4     A.  That's a fact.
5     Q.  Now, are you claiming that you were
6  not able to work anywhere, or you just decided
7  not to?
8     A.  For a while I wasn't able to, and I
9  just don't like, like after that, like I just
10  don't like being -- how do I explain it.  It's
11  hard to get another home health care job, and I
12  don't want to do just deliveries to random
13  people, because I don't like driving, I don't
14  want to get pulled over.  I don't want to have
15  any, like any reason to have contact, you know,
16  with anybody because I get real nervous, you
17  know.
18         I've been pulled over before, and I've
19  acted nervous and, you know, the police
20  actually told me, Dude, are you okay, you look
21  nervous.  And actually pulled me out.  And
22  every time I get like in an altercation like
23  that -- not an altercation, every time
24  something happens like that, the cops arrive
25  and stuff, I just get shaky.

**Page 11**

1     Q.  All right.  How long would you say
2  that you believe you were not able to work?
3     A.  I still don't think I'm able to work,
4  to be honest.  That's why I'm still home.  I'm
5  just doing, you know, the health aide thing,
6  not making much.  I make about 399 every two
7  weeks, so...
8     Q.  What is it when you say home -- strike
9  that.  Home health care?
10     A.  I take care of my mother.  I'm a
11  caregiver for my mother.  She's 70 years old --
12  69.  She will be 70 next year.
13     Q.  You get paid by some third party for
14  doing that?
15     A.  Right.  Biweekly, 399.
16     Q.  I don't want details, do you have to
17  do physically like you did for your uncle, do
18  you have to do that for your mom?
19     A.  Same.  Same.  It's not as bad because
20  she, you know, is more able than him.  But if I
21  have to, I have to.
22     Q.  You haven't applied for disability
23  with the government or anything like that, have
24  you?
25     A.  No, I haven't.  I don't even know how

**Page 12**

1  to do those type things.  No, I haven't.
2     Q.  Have you filed tax returns in the last
3  five years?
4     A.  No.
5     Q.  What would you say, let's talk about
6  physical injuries in this particular incident,
7  how would you describe it?
8     A.  Well, I have pictures of my face, I
9  was scraped on the ground by my face.  I had a
10  sling on my arm.  My elbow was like completely
11  unmovable, and I just been like for that -- for
12  the rest for like two weeks I was in complete
13  body pain.  I could barely even walk, that's
14  how much pain I was in.  I could barely get my
15  arm straight.  I had to take off the sling
16  because it was bothering me.
17         I just been uncomfortable ever since.
18  I haven't been able to work out.  You know, I
19  usually go to the gym three times a week, four,
20  max, and I haven't been able to at all.  Like
21  I've been gaining weight, actually, and I don't
22  know, I'm different.  My knees are different.
23  I can't play basketball anymore.  I'm just
24  different.  Just different.
25     Q.  Which arm was hurt, your left or

