MJC:maz 95465 \Pleadings\95465 74 MIL re hearsay of Lt 5-28-24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NELSON SANTIAGO, ET AL          :
                                :
VS.                             :        C.A. NO. 1:19-cv-00591-JJM-PAS
                                :
MATTHEW SHERIDAN, ET AL         :

**DEFENDANTS' MOTION IN LIMINE RE:**
**HEARSAY TESTIMONY OF PHANTOM LIEUTENANT**

*[In addition to the content of this motion, the defendants incorporate the factual background enunciated in their pre-trial memorandum of law.]*

Now comes the defendants and move, in limine, to preclude the plaintiff, Abel Sanchez from introducing and/or making reference to alleged commentary made by an unknown police lieutenant that it was supposedly Officer Sheridan that struck Sanchez with an object and that this same person later said that it as "wrong for my guys to do that". See Plaintiff Sanchez Dep at pp.47-49, attached as **Exhibit A**.

Such testimony is rank hearsay in its purest form — allegedly made an unidentified person who was not present at the scene and would have no personal knowledge thereof. It is extremely prejudicial, and the granting of this motion should preclude the plaintiff from unintentionally "slipping" such inappropriate testimony before the jury.

| | |
|---|---|
| DEFENDANT, CITY OF PROVIDENCE,<br>By its Attorneys, | DEFENDANT, SHERIDAN,<br>By his Attorney, |
| /s/ Jillian H. Barker<br>Jillian H. Barker, Esq. #8353<br>Senior Assistant City Solicitor<br>/s/ Steven B. Nelson<br>Steven B. Nelson, Esq. #8142<br>Senior Assistant City Solicitor<br>CITY OF PROVIDENCE<br>444 Westminster Street, Suite 220<br>Providence, RI 02903<br>PHONE: (401) 680-5520<br>FAX: (401) 680-5333<br>EMAIL: jbarker@providenceri.gov<br>EMAIL: snelson@providenceri.gov | /s/ Michael J. Colucci<br>Michael J. Colucci, Esq. #3303<br>OLENN & PENZA, LLP<br>530 Greenwich Avenue<br>Warwick, RI 02886<br>PHONE: (401) 737-3700<br>FAX: (401) 737-5499<br>EMAIL: mjc@olenn-penza.com |

## CERTIFICATION

I hereby certify that I have filed the within with the United States District Court on this 6th day of June 2024, that a copy is available for viewing and downloading via the ECF system, and that I have caused a copy to be sent to:

Albert E. Medici, Jr., Esq.
1312 Atwood Avenue
Johnston, RI 02919

Jillian H. Barker, Esq.
Steven D. Nelson, Esq.
Senior Assistant City Solicitors
City of Providence
444 Westminster Street, Suite 220
Providence, RI 02903

/s/ Michael J. Colucci

# EXHIBIT A

CONDENSED

# In the Matter Of:

## SANTIAGO, ET AL V. MATTHEW SHERIDAN

1:19-cv-00591-JJM-PAS

## ABEL SANCHEZ

*April 11, 2023*



800.211.DEPO (3376)
*EsquireSolutions.com*

Page 45

1 remember because it was like such a flash and
2 blur, and all I remember was my face bleeding
3 so much that I was trying to hold it, and I
4 couldn't, because they were holding my hands.
5 So, I just lost the question; what was the
6 question?
7     Q. Did Number 1 ever come back?
8     A. I never seen him again after like what
9 was going on.
10     Q. When he first came up to you, what did
11 Number 1 say and do?
12     A. He didn't say anything. He just
13 said -- he basically like just asked us if we
14 were good or something. He said, okay, just be
15 on your way, and that was it. And he just
16 walked away, and then the other guy came.
17     Q. Did you get the sense that Number 1
18 wanted you guys to head out?
19         THE WITNESS: Did I get to sense?
20     Q. That he wanted you guys to leave the
21 parking lot?
22     A. No. He didn't -- he just asked --
23 what did he ask? I think he asked if we were
24 drinking, and we said no, and then he said, all
25 right, well, get home safe. And then he walks

Page 46

1 away, and then the other guy comes and hell
2 breaks loose.
3     Q. All right. So, nothing else happened
4 with Number 1, then?
5     A. Not that I can recall, no. Maybe with
6 Nelson, I'm not sure, maybe when they grabbed
7 Nelson, he was involved, but as far as I know,
8 I'm not sure. I just remember me getting
9 thrown on the ground by my face.
10     Q. I mean, unless I indicate otherwise, I
11 want you to tell us what you know. The other
12 guys may have told you things you may think,
13 but what you actually saw with your own
14 eyeballs or heard with your own ears is what I
15 want from you, okay?
16     A. I got you.
17     Q. So, One walks away?
18     A. Uh-huh.
19     Q. How much time went by do you think
20 before the second officer came?
21     A. Not even seven minutes, not even five
22 minutes. He walks away, and then the other guy
23 comes like speed walking to the car with a
24 flashlight. I don't even know, I think the guy
25 even hit me with a flashlight, I don't know.

Page 47

1 He was hitting me with something hard in his
2 hand, I don't know what it was.
3     Q. You believe that to be Sheridan?
4     A. I believe so, yeah. After the fact, I
5 think the lieutenant told me it was actually
6 Sheridan, but I just know I was getting like
7 hit real bad. I couldn't see. I was bleeding
8 so much. It was bad.
9     Q. Do you know what the lieutenant's name
10 was?
11     A. No. I just know he released me on
12 Friday with $40 bail.
13     Q. How did Sheridan's name come up?
14     A. The police report, they took me to
15 court for assault and battery on a police
16 officer, and I was confused. My attorney
17 represented me and, you know, we got that
18 thrown out because it was absurd, you know,
19 that's how it went.
20     Q. So did you get Sheridan's name from
21 the report or the lieutenant?
22     A. The report and the lieutenant, maybe,
23 I don't know where I got his name from. It
24 must have been the report or the lieutenant. I
25 think the lieutenant told me. I don't know

Page 48

1 what happened.
2     Q. Did you ask the lieutenant who was it
3 that arrested me?
4     A. No, I didn't. So the lieutenant must
5 have not told me. I must have got it from the
6 report, police report. The reason I thought
7 the lieutenant told me is because the
8 lieutenant spoke to me for a good while after I
9 got released that day, and he told me that it
10 was wrong what they did.
11     Q. Were those the words he used?
12     A. Yeah.
13     Q. Was he on scene, do you know, was he
14 there?
15     A. No. I don't believe he was. He's an
16 older guy.
17     Q. What did he look like?
18     A. I'd say chubby, that's all I can
19 describe.
20     Q. White, black, Asian?
21     A. I know he's not black, and I know he's
22 not Asian. I don't know if he's white. I
23 don't know what white is. Italian, maybe.
24     Q. Hispanic?
25     A. No, not Hispanic. Definitely not



**Page 49**

1 Hispanic.
2    Q. All right. Probably white?
3    A. Yeah.
4    Q. Maybe Italian?
5    A. Maybe Italian. Maybe.
6    Q. All right. So the discussion with the
7 lieutenant, did he go through like the
8 scenario, or did he just kind of say, yeah,
9 yeah, it was wrong what they did to you?
10    A. He pulled me aside because I was just
11 telling him how I'm very badly scarred and how
12 I plan on taking civil action because I don't
13 know what else to do. That, you know, his
14 guys, you know, beat me up real bad. I
15 wouldn't want to do it, but I don't like coming
16 to Providence and coming home with scrapes on
17 my face with black eyes. He was just like, you
18 know what, it was wrong for my guys to do that,
19 I'm just going to let you off today. You know,
20 you're really supposed to get out on Monday,
21 I'm going to let you out. I'm going to give
22 you $40 bail, just pay this, you should be
23 good, just take it to court, it should get
24 thrown out of court, that's what he told me.
25    But I was still bleeding from the

**Page 50**

1 face. I didn't know what else to do, so I
2 called my attorney.
3    Q. Let's go back on the scene. So, one
4 has walked away. A period of time goes by, a
5 second officer comes who you believe to be
6 Sheridan, we'll call him Sheridan for now.
7    A. Yeah.
8    Q. How would you describe what he looked
9 like?
10    A. He was white. White, heavier than me.
11    Q. Tall, short?
12    A. I don't even remember.
13    Q. Skinny?
14    A. He wasn't skinny, he was heavier than
15 me. So I don't know what you would classify
16 that.
17    Q. Was he taller than you?
18    A. I don't know. He was grabbing me like
19 this (indicating), so I wouldn't know how to
20 tell. I was just down in uncomfortable
21 positions. I don't know. He was throwing me
22 from point A to point B, just dragging me
23 around, just trying to prove something to me, I
24 don't know what it was.
25    Q. When he first comes up, Sheridan now,

**Page 51**

1 are you still in the vehicle?
2    A. I think I got out of the car to, I
3 don't know, do what, I don't know what I did,
4 tie my shoe, or something like that.
5    Q. Why would you get out of the car to --
6    A. I don't even know why I got out of the
7 car. I just knew I had to get out of the car.
8 It was either the seat in front of me was
9 reclined too much, or I was trying to fix my
10 legs. I wasn't fully outside the car.
11 Basically, half my body was out of the car,
12 that's when Number 1 left, and he came. It was
13 all fast. It all happened in like the midst of
14 45 seconds. The guy left, Sheridan came, ran
15 to us, I was outside of the car a little bit,
16 and right there he just grabbed me and I'm
17 asking him -- get in the car, swearing, you
18 know, saying a bunch of stuff, I'm like, Dude,
19 I'm not resisting, you're grabbing me. He
20 grabs me with two hands and chokes me like
21 (indicating) this and sticks my head inside the
22 car. At this point I'm halfway inside the car
23 and these guys are like, I don't know what
24 they're doing. I'm just like red, and he drags
25 me back out, drags me by my neck onto the

**Page 52**

1 ground, and that's how I got all the scars.
2    Q. All right. So when he first comes up,
3 the second officer, assuming it's Sheridan, he
4 first comes up, you're halfway out of the car?
5    A. I believe so. I believe so, because
6 as soon as he left, that's when the other guy
7 came.
8    Q. The door is open, then, obviously?
9    A. Yeah.
10    Q. All the other doors to the car were
11 shut?
12    A. I'm not sure. Maybe. Maybe not.
13    Q. For some reason you were getting out
14 of that vehicle?
15    A. Yeah, for some reason I was like --
16 had one foot out of the vehicle or something.
17 I don't know if that's a crime or --
18    Q. Did it have anything to do with who
19 was driving?
20    A. No. I don't drive, anyways, so I
21 don't -- I drive, I have my license, but I'm
22 not -- out of us, I'm not the designated
23 driver, it's either Nelson or Jose. Me and
24 Kenny usually don't drive.
25    Q. Okay. Who spoke to each other first,